(June 28, 1913.)

DAVIDSON GROCERY CO., a Corporation, Respondent, v. DUNCAN JOHNSTON and JULIUS RAABE, Appellants.

[133 Pac. 929.]

PLEADING—VARIANCE—RIGHT OF RECOVERY FOR TORTIOUS TAKING OF PERSONAL PROPERTY—ACCOUNT STATED—SUFFICIENCY OF EVIDENCE.

1. Variance means material difference. It is not a variance when the proof does not show all the points in a declaration. Variance arises when there is a substantial departure from the issue in the evidence adduced, and must be in some matter which in point of law is essential to the charge or claim.

2. Where a complaint alleges a cause of action for the recovery of the value of personal property sold and delivered, and the evidence shows a tortious taking and conversion, the action is one of *assumpsit* upon contract of sale and promise, and if demand is made for the property and the property is not delivered to the seller,

and the answer admits that the defendant had purchased personal property of plaintiff and paid for it, and alleges payment for all the property bought and purchased of the plaintiff, recovery may be had for the value of the property proven to have been tortiously taken.

3. Where the evidence offered is in support of the pleadings consisting of the complaint and the answer, the evidence is not in variance with the allegations of the pleadings. The right of recovery arises under the rule of law that the owner of the goods may sue to recover the reasonable value thereof on the rightful assumption that the taker proposed, not to take the same without compensation to the owner, but to pay him the reasonable value thereof.

4. An account stated is a document, a writing which exhibits the state of account between the parties, and the balance owed one to the other, and when assented to, either expressly or impliedly, it becomes a new contract. An action upon it is not founded upon the original items, but on the balance agreed to by the parties; but the account, in order to constitute a contract, should appear to be something more than a mere memorandum. It should show upon its face that it was intended to be a final settlement up to date, and this should be expressed with clearness and certainty.

5. Where there is a substantial conflict in the evidence, the verdict of the jury will not be set aside by this court on appeal.

6. *Held,* that the evidence supports the verdict of the jury.

APPEAL from the District Court of the Third Judicial District for Ada County. Hon. Carl A. Davis, Judge.

Action in *assumpsit* to recover the value of personal property where it was tortiously taken. Judgment for plaintiff. *Affirmed.*

Hawley, Puckett & Hawley, C. M. Kahn and C. H. Edwards, for Appellants.

Plaintiff, having seen fit to "waive" the tort, is bound by such waiver for all time, and cannot again refer to the same, either by evidence or otherwise. If he desired to sue upon an implied contract growing out of the tortious acts of the defendants and to rely upon the evidence of such tortious acts in order to establish the implied contract, the complaint

did not show that desire. It would be necessary for it to go further and to allege in its complaint those very tortious acts from which the promise could be implied, otherwise the very object of the reform system of pleading would be subverted. The pleading of one state of facts and the introduction of evidence tending to establish another is not permitted even under the doctrine of waiver of tort. The defendant is entitled to know what the plaintiff expects to prove, and a complaint which permits proof of both contract and tort will not be countenanced. (Pomeroy, Remedies and Remedial Rights, sec. 572, p. 536; *Phillips v. Mashbrook,* 24 Mo. App. 129; *Knickerbocker Min. Co. v. Hall,* 3 Nev. 194; *Houston E. & W. T. Ry. Co. v. Ryan* (Tex. Civ. App.), 38 S. W. 221; *Finlay v. Bryson,* 84 Mo. 664; *Stockert v. Mackey, Nesbit & Co.,* 34 Ill. App. 476; 2 Abbott's Trial Brief, pp. 1683, 1715, secs. 129, 152; *McFadden v. Sims,* 43 Tex. Civ. App. 598, 97 S. W. 335; *Tacoma Mill Co. v. Perry,* 40 Wash. 44, 82 Pac. 140; *Sandeen v. Kansas City, St. J. Ry. Co.,* 79 Mo. 278; *Cropsey v. Sweeney,* 27 Barb. (N. Y.) 310; *Peay v. Salt Lake City,* 11 Utah, 331, 40 Pac. 206; *Wilson v. Haley Livestock Co.,* 153 U. S. 39, 14 Sup. Ct. 768, 38 L. ed. 627; *Degraw v. Elmore,* 50 N. Y. 1; 13 Ency. of Evidence, 651.)

The accounts rendered during the time it was alleged in the complaint that the defendants became indebted to the plaintiff were accounts stated, and as far as the relation of debtor and creditor is concerned, these accounts stated fully settled the same. (1 Cyc. 364, 380; 1 Standard Ency. 210.)

After an account stated has been proven as in this case, it will be presumed, in the absence of evidence to the contrary, to include all items then due from one to the other. (1 Ency. of Ev. 184; *Taylor v. Thwing,* 21 Misc. 73, 46 N. Y. Supp. 892; *Johnson v. Johnson,* 4 Call (Va.), 38.)

Concealment or misrepresentation by the debtor is no reason to open an account stated. (*Vance v. Supreme Lodge of Frat. Brotherhood,* 15 Cal. App. 178, 114 Pac. 83; *Johnson v. Gallatin Valley M. Co.,* 38 Mont. 83, 98 Pac. 883.)

Cavanah, Blake & MacLane, for Respondent.

The Code of Civil Procedure was adopted *verbatim* from the California code of 1872, and the cases under that code are, therefore, peculiarly appropriate, being, in effect, binding and not merely persuasive authorities. That court has consistently held, from the earliest times, that *assumpsit* for goods sold and delivered may be maintained on facts constituting a conversion or theft. (*Fratt v. Clark,* 12 Cal. 89; *Roberts v. Evans,* 43 Cal. 380; *De La Guerra v. Newhall,* 55 Cal. 21; *Lehmann v. Schmidt,* 87 Cal. 15, 25 Pac. 161; *Heidt v. Minor,* 89 Cal. 115, 26 Pac. 627.)

The question has been considered by the court of Montana, under a code likewise adopted from California. (*Galvin v. Mac. M. & M. Co.,* 14 Mont. 508, 37 Pac. 366. See, also, *Crown Cycle Co. v. Brown,* 39 Or. 285, 64 Pac. 451; *Hirsch v. Leatherbee Lumber Co.,* 69 N. J. L. 509, 55 Atl. 645; *Downs v. Finnegan,* 58 Minn. 112, 49 Am. St. 488, 59 N. W. 981; *Terry v. Munger,* 121 N. Y. 161, 18 Am. St. 803, 24 N. E. 272, 8 L. R. A. 216; *Challiss v. Wylie,* 35 Kan. 506, 11 Pac. 438; *Norden v. Jones,* 33 Wis. 600, 14 Am. Rep. 782; *Braithwaite v. Akin,* 3 N. D. 365, 56 N. W. 133. Cases cited in 4 Cyc., tit. "Assumpsit," 332; 5 Cent. Dig., tit. "Assumpsit," sec. 50.)

There was no account stated under the facts of this case, and if there was such an account, it was thoroughly and completely impeached. (*Coffee v. Williams,* 103 Cal. 550, 37 Pac. 504; *Beltaire v. Rosenberg,* 129 Cal. 164, 61 Pac. 916; *Harrison v. Henderson,* 67 Kan. 202, 72 Pac. 878.)

No account stated could arise out of the transactions here involved, because the defendant denies the liability and denies the receipt of the goods in question, and an account stated cannot be used as a basis of creating a liability where none existed, but simply for the purposes of determining the amount of an admitted liability. (1 Ency. L. & P. 707; *Lemere v. Elliott,* 6 Hurl. & N. 656, 30 L. J. Ex. 350, 7 Jur., N. S., 1206; *Austin v. Wilson,* 11 N. Y. Supp. 565; *Kemp v. Peck,* 59 Hun (N. Y.), 118.)

An account stated may be impeached for fraud or mistake, and whether it has been so impeached is a question of fact for the jury. (*Colorado F. & I. Co. v. Chappell,* 12 Colo. App. 385, 55 Pac. 606.)

Where there is a substantial conflict in the evidence, the verdict of a jury will not be disturbed. Attention is called to the fact that no motion for a new trial has been interposed in this cause. (*Buster v. Fletcher,* 22 Ida. 172, 125 Pac. 226.)

STEWART, J.—This is an action for conversion of personal property of the value of $7,517.25. The case was tried to a jury and a verdict was rendered in favor of the plaintiff for the sum of $5,000. An appeal was taken from the judgment and the evidence is brought to this court on appeal for review.

The complaint alleges that the Davidson Grocery Company is a corporation, existing under the laws of Idaho, and that between the 1st day of December, 1910, and the 5th day of January, 1912, the plaintiff sold and delivered to the defendants, at the special request of said defendants, about 25,725 pounds of coffee of the reasonable value and agreed price of 25 cents per pound; 3,600 pounds of tea of the reasonable value and agreed price of 30 cents per pound; 100 pounds of sugar of the reasonable value and agreed price of 6 cents per pound, amounting in the aggregate to the sum of $7,517.25; that said sum nor no part thereof has been paid and that the same is due.

A separate answer was filed by each of the defendants. The defendant Raabe denies the incorporation of the plaintiff company, for lack of knowledge or information sufficient to form a belief; the defendant also specifically denies the portion of the complaint alleging the sale and delivery of the property described in the complaint. As a separate answer and defense the defendant also alleges that during the times mentioned in the complaint the defendant was and is engaged in conducting a retail coffee, tea and spice business in Boise, and that plaintiff was at all times mentioned in the complaint, and long before and still is engaged in conducting a

wholesale grocery and coffee roasting business in Boise, and doing a jobbing business in coffees, teas and spices, and that during said time there existed a certain course of business dealings and transactions consisting of the purchase from the plaintiff by the defendant of coffees, teas and spices and such other articles of merchandise as are usually handled and kept and sold by retail dealers, and that during such transactions between plaintiff and defendant the plaintiff has always at the time of delivery of goods so purchased from plaintiff made, rendered and delivered to the defendant its itemized bill, showing the kind, quantity and price of each article of goods; and on the 1st and 15th day of each and every month during the entire course of such business dealings and transactions between plaintiff and defendant, plaintiff would make and render to defendant its account stated of every and all transactions; that the accounts stated contained a full and correct statement of all goods sold and delivered and said accounts were accepted, acquiesced in and paid by the defendant, and said payments were accepted by plaintiff, and every one of the accounts stated was received and marked paid by plaintiff and by it returned to the defendant, Julius Raabe.

The answer of defendant Johnston denies the specific allegations of the complaint and denies any indebtedness to the plaintiff.

Three questions are presented to the court: (1) That there is a variance between the pleading and proof, in that allegation of sale and delivery does not permit proof of a tortious conversion; (2) That the semi-monthly bills rendered by plaintiff constituted an account stated, which is binding upon the parties; (3) That the evidence is insufficient to justify the verdict.

We will consider these questions separately.

(1) Was there a variance between the pleading and proof, in that the allegation of sale and delivery does not permit proof of a tortious conversion. While the allegation of the complaint does allege a sale and delivery, and does not allege tortious conversion, and the evidence shows that the goods

were taken by the defendant and converted to his own use without consent of plaintiff, yet the courts seem to hold that where personal property is tortiously taken, the party aggrieved may waive the tort and sue in *assumpsit* for the value of the property. This is the rule announced by the supreme court of California in the case of *Fratt v. Clark*, 12 Cal. 89, and is cited and approved in other cases decided by that court. (*Roberts v. Evans*, 43 Cal. 380; *De La Guerra v. Newhall*, 55 Cal. 21; *Lehmann v. Schmidt*, 87 Cal. 15, 25 Pac. 161.)

Cyc., in vol. 4, p. 332, announces a rule which seems to apply to the question under consideration, and the author says: "All the authorities agree that, where personal property is tortiously taken and converted into money or money's worth, the owner may waive the tort and sue the wrongdoer in *assumpsit* for its value." The author also calls attention to the views of many courts as to the right of the owner to sue in *assumpsit* where the wrongdoer has not sold or otherwise disposed of the property but retains it for his own use, and cites the courts approving the rule, that if the wrongdoer has not sold the property, but still retains it, the plaintiff has a right to waive the tort and proceed upon an implied contract of sale to the wrongdoer. In the citations the states of California, Kansas, Mississippi, Missouri, Montana, New York, North Dakota, Oregon, Tennessee, Wisconsin are referred to.

The complaint alleges a sale and delivery of the personal property, and that demand has been made for the reasonable value of said property. The defendant in his answer alleges business dealings and transactions between the defendant and the plaintiff, consisting principally of the purchase from plaintiff by defendant of coffee, tea, spices and other articles kept and sold by retail dealers, and that the plaintiff has always at the time of delivery of the goods and wares so purchased from plaintiff by defendant made, rendered and delivered to the defendant its itemized bill or invoice showing the goods and quantity and price of the articles sold and purchased.

Upon the trial a demand was made by defendant of plaintiff for a bill of particulars, and a bill of particulars was furnished by plaintiff which shows upon its face different articles, and shows: ''Duncan Johnston and William Raabe to Davidson Grocery Company, Dr. April 27, 1912.'' Then follow dates, the pounds of the articles and the price, the total of which is $7,602.35, and a credit is given for a double charge in December, 1911, leaving a balance of $7,486.10.

The evidence offered was in support of the pleadings, both the complaint and the answer, and the evidence was not in variance with the allegations of the pleadings, and the rule declared by the supreme court of Montana in the case of *Galvin v. MacM. & M. Co.*, 14 Mont. 508, 37 Pac. 366, in accord with the other authorities above cited, applies in the present case.    The court said:

''The point is raised by appellant that there is a fatal variance between the proof and the allegations of the complaint, because the complaint alleges a sale of personal property described, and seeks to recover the reasonable value thereof, but the proof shows a tortious taking and conversion. The complaint is in the nature of *assumpsit* upon contract of sale and purchase, but the proof discloses a tortious assumption, detention, and unwarranted refusal to deliver said stock to plaintiff on his demand therefor; and these facts, together with the implication which the law draws therefrom, are relied upon to support the complaint alleging a sale. No variance can be maintained on such a situation. The authorities at common law, and also those relating to code procedure and remedies, hold that a declaration in *assumpsit* is supported by proof of the wrongful taking and conversion of personal property; but there is a line of cases which confines the right of election to waive the tort and sue and recover the value of the goods converted as if sold to the wrongful taker to cases where the latter had himself disposed of the property. This distinction has received very careful consideration and extended discussion by courts of last resort, and we think the great weight of reason and authority—especially of decisions under the reformed procedure—disregard that distinc-

tion as immaterial in cases where the owner of the goods sues to recover the reasonable value thereof, on the very proper and rightful assumption that the taker proposed, not to take the same without compensation to the owner, but to pay him the reasonable value thereof."

The evidence shows the facts that during the period of dealing between the parties Raabe was a customer of the Davidson Grocery Company, and as such customer was every month buying large quantities of teas and coffees from that company; for these purchases he was given semi-monthly bills, which he promptly paid. These bills, however, did not cover, or purport to cover, the items in issue in this case which Raabe is claimed to have converted, nor was any such conversion known or suspected by plaintiff until about January 5, 1912, and the bills rendered subsequently to that time were rendered simply for the semi-monthly periods, not for general balance. These bills as rendered were to the Boise Tea and Coffee Company, of which Raabe was proprietor and owner, and not to the partnership of Johnston and Raabe. It appears also that the Davidson Grocery Company did not discover that these goods were being taken from the respondent until January 5, 1912, at which time the president of the plaintiff company became suspicious of the defendants and made an investigation in connection with others, and satisfied himself that the defendants had been taking coffee, tea and sugar from the plaintiff without accounting for such property, and discovered that Johnston was delivering coffee and tea to Raabe, and upon making such discovery discharged Johnston and forbade Raabe from coming to the plaintiff's place of business. We shall discuss this question further on, but this is sufficient to show that there was no variance between the complaint and the evidence.

Variance means material difference. It is not a variance when the proof does not show all the points in a declaration. A variance arises when there is a substantial departure from the issue in the evidence adduced, and must be in some matter which in point of law is essential to the charge or claim. (*Keiser v. Topping,* 72 Ill. 226; *Warrington v. State,* 1 Tex.

App. 168; *House v. Metcalf,* 27 Conn. 631; *Plumb v. Griffin,* 74 Conn. 132, 50 Atl. 1; *Skinner v. Grant,* 12 Vt. 456; *State v. Wadsworth,* 30 Conn. 55.)

(2) Did the semi-monthly bills rendered by plaintiff constitute an account stated which is binding upon the parties? The answer of Raabe contains a special defense, wherein it is alleged that statements of account were given to him twice each month, and were paid, and were made after the plaintiff had reason to believe that there was a taking of property wrongfully by the defendants, and in such answer it was alleged that all of said accounts were accepted, acquiesced in and paid by the defendant, and every one of said payments was accepted by plaintiff, and each and every one of said accounts stated was received and marked paid by plaintiff and by it returned to defendant Raabe, and by reason of such facts that the plaintiff is barred the right to recover by an account stated between the parties and paid by appellant.

The general rule of definition of an account stated is: An account stated is a document, a writing, which exhibits the state of account between parties and the balance owed one to the other, and when assented to, either expressly or impliedly, it becomes a new contract. An action upon it is not founded upon the original items, but upon the balance agreed to by the parties. But the account, in order to constitute a contract, should appear to be something more than a mere memorandum; it should show upon its face that it was intended to be a final settlement up to date, and this should be expressed with clearness and certainty. (*Beltaire v. Rosenberg,* 129 Cal. 164, 61 Pac. 916; *Harrison v. Henderson,* 67 Kan. 202, 72 Pac. 878.)

It is proper here, however, to call attention to the fact that the answer of defendant Raabe denies the liability of the defendant and also the allegations of the complaint, which consist of allegations of sales and delivery of certain quantities of coffee and tea, but alleges that he purchased and received certain coffee and tea from the plaintiff for which he received bills semi-monthly, and that he paid such bills. It

will thus be observed that it is not alleged in the answer that the goods covered by the bills alleged to have been received by the defendant from the plaintiff monthly were the same goods alleged in the complaint to have been sold by plaintiff and delivered to defendant. We are not aware of any rule of law that an account stated arises against a creditor by the making and delivery by a wholesale merchant to a retail dealer, who purchases goods from the wholesaler, of bills monthly for goods sold and delivered, or that the payment of such bills precludes the creditor from recovering for additional or other items of goods not known to the plaintiff to have been taken from his store at the time of the rendition of such bills and not covered by the monthly bills delivered and paid, when such goods were taken extending through a long period of time and undiscovered.

In the case of *Colorado F. & I. Co. v. Chappell,* 12 Colo. App. 385, 55 Pac. 606, the Colorado court of appeals quotes with approval from *Perkins v. Hart,* 11 Wheat. (U. S.) 237, 6 L. ed. 463, the following: " 'If, to a bill for an account, the defendant plead, or in his answer rely, upon a settled account, the plaintiff may surcharge by alleging and proving omissions in the account, or may falsify by showing errors in some of the items stated in it. The rule is the same in principle at law. A settled account is only *prima facie* evidence of its correctness. It may be impeached by proof of unfairness or mistake, in law or in fact.' That was an action of *indebitatus assumpsit,* to which a settlement upon an account stated was interposed as a defense. The charges, in this replication, of fraud and misrepresentation by the defendant, did not constitute the statement of a cause of action. The real question was whether the settlement was intended to embrace this controversy. If the coal and iron company was ignorant of the existence of the facts out of which the controversy finally arose, then the claim now asserted was not intended to be, and was not, included. The replication asserted a want of knowledge of facts which it was necessary to know in order to a settlement of the matter in litigation; and the fraud of the plaintiff was alleged, not as a groundwork of an

action, but as a reason for the ignorance. The cause of action was the misappropriation by the defendant of the money of the coal and iron company, to whose right the plaintiff had succeeded; and surely the defendant's act was none the less a conversion, and the conversion was none the less wrongful, because of his false representation concerning the use made by him of the money. His fraudulent practices in connection with the act did not change the legal character of the act.''

The monthly bills could in no way come within the rule announced above of an account stated, and could in no way bind the parties in this action, except as to the items contained in them.

(3) Is the evidence sufficient to justify the verdict? This contention is the real question upon which a reversal is urged.

There are 333 closely written pages of typewritten evidence, and upon the entire evidence there is no question but that there is a conflict upon certain facts testified to by witnesses for the plaintiff and denied by witnesses for the defendant in many of the particulars involved in the transactions which tended to show the secret conversion of the property, the value of which is involved in this case. This court, however, in considering this matter is guided by the universal rule adopted by this court, that where there is a substantial conflict in the evidence, the verdict of the jury will not be disturbed, and it is useless to cite authorities. The code prescribes the rule: Sec. 4824. ''Upon an appeal from a judgment, the court may review the verdict or decision and any intermediate order or decision, if excepted to, which involves the merits or necessarily affects the judgment, except a decision or order from which an appeal might have been taken: Provided, That whenever there is substantial evidence to support a verdict the same shall not be set aside.''

Guided by this rule we will refer in a brief way to the evidence, which shows that the Davidson Grocery Company was engaged for several years in the wholesale business in Boise, and as such sold coffee, tea and spices, etc. During nearly all the time between December 1, 1910, and January 5, 1912, the period covered by the allegations of the complaint

and shown in the bill of particulars introduced in this case, for which the action was brought to recover the value thereof, Johnston, one of the defendants and appellants, was in the employ of the respondent and had charge of the coffee and tea department of the company, and his duties were roasting coffee and delivering it and other articles on orders only sent from the main office of the company, which sales were recorded in a book kept there under his supervision, and such book was introduced in evidence. There was also a young man by the name of Simonsen who was working under the direction of Johnston. The defendant Raabe during this time was engaged in the retail business of coffee, tea and sugar at Boise, under the name of the Boise Tea and Coffee Company, and was a constant customer of the plaintiff. He would often come to the plaintiff's place of business in person about noon, and receive coffee, tea and sugar, which were delivered to him by Johnston at the tea and coffee department of the plaintiff.

There is some evidence which shows that other proprietors who were customers of plaintiff did not make a general practice of coming in person for goods, but generally sent drivers or the plaintiff delivered the goods. It was the rule of plaintiff to have the goods charged at the time the order came to the plaintiff, or if the goods were to be delivered at a future date, the entry was made upon the company's books as they were delivered. An arrangement was made between the plaintiff and the defendant Raabe, by which he was to have a discount of five per cent on all purchases over 800 pounds in any one month. About twice each month the plaintiff would send to the defendant Raabe statements of the account of the Boise Tea and Coffee Company. None of these monthly statements, except a few commencing December 11, 1911, covered the transactions included in the complaint or bill of particulars. The reason for this, as shown by the evidence, was that the plaintiff did not know about these at the time the statements were made out.

About January 5, 1912, Davidson, president of the plaintiff company, became a little suspicious about the conduct of the defendants, and this led him to investigate, and he secured

other parties and made investigation, and by such investigation the defendants were caught in taking the goods of plaintiff, and because of this act Johnston was discharged and Raabe was notified not to come to plaintiff's place of business.

The evidence shows the details of the facts relating to the acts of the defendants in taking sacks of coffee and tea from the plaintiff's place of business, and also the conversation that was had by the president of the plaintiff company with Raabe, at the latter's place of business, after this discovery, wherein Davidson asked Raabe, "Where is that tea?" to which he replied, "What tea?" Davidson answered, "The tea you just brought up," and, while they were talking, Davidson went back of the partition there and saw the two chests of tea. Then he said, "These two chests of tea, what about this? Those two chests of tea, where is a bill for that tea?" Raabe replied that Johnston was going to give him a bill. Davidson requested him to put the tea and coffee in the wagon and go back to his place of business. When they arrived there, Raabe remained—at Davidson's request—on the front platform of the building while Davidson went up to the third floor, where Johnston was. Johnston was then asked what was the weight of the tea that the Boise Tea and Coffee Company got that morning, to which Johnston replied, "He didn't get any tea." Davidson then said, "Well, he has—well, he did take two chests of tea away from here this morning, and I have gone up there and brought them back, and the tea. He is downstairs now and I want you to come down and confront him." Johnston then said, "Oh, yes, yes; I did put two chests of tea down on the front platform, and I guess he took them up there. That's all right." Davidson replied that it was not all right, as he had been watching him before that and had discovered a number of instances where he had been doing this same thing. When Johnston came down where Raabe was he endeavored to make the excuse that he was going to sell Raabe five chests of tea and that he just sent up these two chests and would charge the rest afterward.

This is only one instance of taking which was secretly discovered by plaintiff and which was related as evidence in the case.

It could not aid this case to relate all of these instances. They were testified to and the jury heard the evidence. The plaintiff testified that from the examination of the books kept by Johnston he found that on December 9, 1910, Johnston charged Raabe with 2,600 pounds of coffee, and between that date and December 31, 1910, he had delivered to him 1,985 pounds; and on January 3, 1911, he gave him 1,600 pounds more, Johnston claiming that the 1,600 pounds had been charged on December 9, 1910, and paid for. This made 3,585 pounds he had delivered to Raabe, when he should have delivered only 2,600 pounds, making 985 pounds which Raabe received without any charge or payment being made therefor. This was testified to by Davidson, and the jury evidently believed what the witness said upon this question, and we think the jury were justified in their conclusion. The credibility of this witness and his statements and the books which Johnston kept, and which were in evidence, deserve credit, and are convincing proof.

There is positive and certain evidence by a number of witnesses as to specific acts of taking coffee, tea and sugar, and we will recite here an incident. The witness Sargent, a merchant at Collister station, was at the plaintiff's place of business about noon on September 19, 1911, and saw Johnston hand Raabe a 100-pound sack of sugar in the following manner: Q. "You may state what you saw him do, if anything, at that time and place." A. "On the 19th day of September, about the noon hour, I heard Mr. Johnston ask Mr. Raabe if he got that; he said no, and Mr. Johnston said to him to get on his wagon. Just at that time, all the Davidson Grocery Company's employees were all off of the first floor. I saw Johnston grab a sack of cane sugar, carry it a distance of about twenty feet, and hand it to Mr. Raabe at the front end of his delivery wagon. Johnston went back to the building and Mr. Raabe went up town." Q. "Then, did he take this sugar away that Johnston handed him?" A. "He did."

Davidson, the president of the plaintiff company, after making the discovery on or about January 5, 1912, had an examination made of the stock-book that was kept as a gen-

eral index or measure of the business which Johnston was doing. Each page represented a month and the days of the month were entered in the left-hand column. In parallel columns were headings of the different grades of coffee, and the last column, with the exception of the totals, showed deliveries to the Boise Tea and Coffee Company, which was the plaintiff's principal customer. This book was Johnston's own record as to the amount of coffee put out by his department. The examination which Davidson had made disclosed, that by comparing this book with the charges made in the office downstairs, it was found that Johnston had sent through his department certain amounts of coffee in excess of the charges made on the books. The account is somewhat extensive, and it is sufficient to say that the total shortage is shown as $6,246.

The importance of these books to Johnston, and his transactions as there disclosed, is shown very clearly by the witness Simonsen. Simonsen was asked this question: "Did you have any talk with Mr. Johnston shortly after January 5, 1912? If so, state what it was." A. "On the night of January 8th I went to the telephone. Mr. Johnston had called me and asked me if I would walk down Franklin street. [Here follows the route.] . . . . He said he wanted to talk with me. So I said I would and hung up the phone, and Mrs. Simonsen asked me where I was going, and I told her; she advised me not to go, so I telephoned, called Johnston's residence, and Mrs. Johnston answered the telephone, and I asked her for Mr. Johnston, and she said that he had just left; so I told her that I wasn't going to meet him. She says, 'Now, Seymour.' So I went out and turned on the porch light and waited for Mr. Johnston to come. A few minutes later he came down to the house, and I told him to come in the parlor, where it was warm. He said no, he would rather talk with me in the hall alone, and so I went in the hall and talked to him. He requested me to burn up a coffee book that he had kept a record of the business previous to January 1, 1911. He says, 'All the records are recorded from this book into the book we are keeping the records in now and nobody but you and I know that the book is up there.' He said: 'I have done a great deal for you and I would like to have you do that much for me.' He says: 'I

haven't slept for three nights and if you will do that it will ease my mind.' I wouldn't promise him that I would do it. I told him I was willing to do anything that was right for him or the Davidsons, either one, only I didn't know that that was right. He says: 'You know that in the book that—that isn't in the other book and it won't do any harm to burn it.' And he says: 'You have got a good thing down there and I wouldn't work there again. I would probably work a week to get my reputation back.' He says: 'I don't want to. I wouldn't work there any more, only, whatever you do look out for the Jew; he will get anyone in trouble.' "

He testified also that the next morning Johnston came down to the store and that there was another party there and they talked a few minutes, and as quick as the other gentleman left Johnston asked Simonsen if he had burned the book. "I told him no. He asked me where it was, and I told him that I had hid it, and that was all that was said about the book. Only a few minutes later we were talking about business."

This question was asked the witness: "Now, what book did he have reference to? I hand you plaintiff's exhibits Nos. 1 and 1-A." A. "This is the book that he had reference for me to burn."

There is much other evidence and the books were introduced and different accounts presented and many statements made by different witnesses for the plaintiff and denied by witnesses for the defendants, but upon all the evidence, conflicting as it may be upon specific acts and conduct of the defendants in the taking of the property, and the condition of the books and the statement of Johnston, the jury having passed upon the weight of the evidence and what part of the evidence was convincing, and having determined the preponderance of the evidence, this court does not feel justified in setting aside the verdict. Much of the evidence in this case is circumstantial and there is a mass of figures and details, and the jury having determined these questions and having given due consideration to the weight of evidence and such facts not being explained or in any way excused, there can be but one conclusion, and that is that Raabe and Johnston conspired together for

illegal purposes, and that the acts carried out by them in pursuance of their concerted action with reference to the taking and converting of the property taken were sufficient to show they were wrong and that the jury were justified in finding the verdict rendered.

We find no reversible error in the record. The judgment is *affirmed.* Costs awarded to respondent.

Ailshie, C. J., and Sullivan, J., concur.