[Civ. Nos. 3336 and 3337. Third Appellate District.—January 13, 1928.]

J. L. ARMSTRONG, Respondent, v. KUBO & COMPANY, Appellant.

Robert H. Schwab and W. E. Davies for Appellant.

Ray Manwell for Respondent.

PLUMMER, J.—Plaintiff filed two complaints in the court below against the defendant, had judgment against the defendant in both actions, and as the evidence in the actions is the same, both are presented to us for consideration upon one transcript.

In action No. 5819 in the trial court the complaint alleges as follows: That within one year last past the defendant became and now is indebted to the plaintiff in the sum of $653, lawful money of the United States of America, being the balance due the plaintiff from the said defendant for the reasonable value of goods, wares, and merchandise stolen and taken from plaintiff by defendant and carried away to defendant's place of business without the plaintiff's consent or permission. That the value of said goods, wares, and merchandise was the sum of $653. Also that all of said goods, wares, and merchandise were taken and carried away by the defendant from the possession of the plaintiff without plaintiff's consent or permission between the twenty-third day of January, 1926, and the twelfth day of June, 1926, at Marysville, in the county of Yuba, state of California, and that the defendant did thereafter unlawfully convert and dispose of the same to its own use, to the damage of the plaintiff in the said sum of $653.

In action No. 5854 the charging portions of the complaint are to all intents and purposes, identical with the complaint in action No. 5819, the only difference being that the value of the property is alleged to be the sum of $1,005.41. In action No. 5819 the plaintiff had judgment in the sum of $53.10, and in action No. 5854 judgment went for plaintiff in the sum of $643.32. No demurrer was filed by the defendant to either one of the plaintiff's complaints. Upon appeal, however, it is insisted that the plaintiff's complaints do not state a cause of action; that the form of action as presented by the record cannot be sustained, and, further,

that the evidence is insufficient to support the findings of the trial court.

The record shows that the plaintiff in the year 1926 had a contract with the United States government to transport mail from Yuba City, Sutter County, and Marysville, Yuba County, postoffices to the Southern Pacific Railway, Northern Electric Railway, and Western Pacific Railway depots in said cities, and to receive from said trains United States mail and transport the same to said postoffices. The mail was transported in a screened automobile truck belonging to the plaintiff. The truck was operated by the plaintiff in the daytime and during the night by an employee of the plaintiff named Edgar Goldstone. During the period of time mentioned, a number of packages of mail consisting of goods, wares, and merchandise shipped or transported by mail, were extracted from the mails, or, rather, stolen by the said Edgar Goldstone, and sold to the defendant in this action. It appears that Kubo & Company consisted of a Japanese named Kubo and a Japanese named Hashimoto. The store conducted by Kubo & Company was situated in the town of Marysville, about seventy-five feet from the United States postoffice therein. A number of the articles extracted from the mails consisted of insured parcels shipped to various persons at the places named, and were sold to the defendant in this action. The circumstances show beyond question that the defendant had full knowledge that all the articles received from Goldstone were stolen by him. The different packages delivered by him to the defendant bore the names and addresses of the consignees in most instances, and were delivered under such circumstances as to unavoidably force the conclusion that the defendant was, to all intents and purposes, an accomplice in the various thefts. Two actions were begun against the defendant to recover the value of the property taken from the mails by Goldstone and sold to the defendant. This is accounted for by reason of the fact that when the first action was begun it had not then been discovered that the goods referred to in the second action had also been stolen from the mails by Goldstone while employed by the plaintiff, and sold to the defendant. When this discovery was made the second action was begun. When the extent of the thefts by Goldstone had been discovered and the value of the parcels stolen ascertained,

the plaintiff in this action turned over and paid to an agent of the United States Postal Department the full value of all the stolen parcels for the purpose of making settlement with the various consignors of the parcels that had been stolen. ▮ After making such settlement the plaintiff instituted said actions to recover the value of the goods unlawfully converted by the defendant. Can such actions be maintained? We think so. The law seems to be well settled that every bailee or person clothed with the exclusive right of possession has a temporary or qualified ownership in the property to the extent of enabling him to maintain actions in respect thereto against third parties. (*Bode* v. *Lee,* 102 Cal. 583 [36 Pac. 936]; *Roberts* v. *Burr,* 135 Cal. 156 [67 Pac. 46]; 3 R. C. L., p. 85; 6 C. J. 1107.) Other cases might be cited, but the foregoing are sufficient. In the case of *Bode* v. *Lee, supra,* it appears that a number of boxes of tin had been left with the proprietors of a ' warehouse by different consignors, and the court, in speaking of an action by the warehouse owners against one who had wrongfully obtained possession of said boxes of tin, used the following language—we are quoting from the, syllabus: "The proprietors of a bonded warehouse who are the bailees of boxes of tin left in the warehouse by several different bailees have a single cause of action to recover for fraudulent conversion of the tin by persons obtaining it through embezzlement by an employee of the warehouse with whom they had conspired for the purchase of the tin," etc. This case is almost identical with the one at bar.

In 3 California Jurisprudence, page 377, we find the following: "Despite the general principle that an action of *assumpsit* is based upon a contract, express or implied, in some instances such an action may be maintainable as founded upon an implied contract when in fact there is no contract at all. For instance, if B stole A's watch, A could treat the theft as a contract of sale and sue in like manner *ex contractu,* though in fact there was no foundation whatsoever for the fiction other than the need of broadening A's remedies. In other cases of *assumpsit* upon implied contract, the contract may lie at the base of the wrong or may have enabled the perpetrator to have accomplished his wrong. In short, it may be pronounced as a general rule, repeatedly sanctioned by the courts of California, that where

personal property is wrongfully converted, the owner may waive the tort and sue in *assumpsit.*" Again, on page 379 of the same volume, quoting from section 7: "In many jurisdictions the doctrine that where the personal property is wrongfully converted, the injured party may waive the tort and sue in *assumpsit* is limited to cases where the wrongdoer has sold the property or otherwise converted it into money, in which event the plaintiff may maintain an action for the proceeds. But in California, as in a number of other states, a broader rule enables one whose goods are wrongfully taken and used by another to sue in *assumpsit* for their value as for goods sold and delivered." This latter statement of the law is clearly set forth in the case of *Bechtel* v. *Chase*, 156 Cal. 707 [106 Pac. 81], where, after speaking of the limited amount which may be recovered in *assumpsit*, this broader rule is stated: "In this State, however, as in a number of others, a broader rule enables one whose goods are wrongfully taken and used by another to sue in *assumpsit* for their value, as for goods sold and delivered" (citing *Roberts* v. *Evans*, 43 Cal. 380; *Lehmann* v. *Schmidt*, 87 Cal. 15 [25 Pac. 161]; *Chittenden* v. *Pratt*, 89 Cal. 178 [26 Pac. 626]). In *Corey* v. *Struve*, 170 Cal. 170 [149 Pac. 48], the court, in considering this question, thus states the law: "While the complaint does allege that the property was 'converted' by the defendants, we think that the action was in reality one in *assumpsit* for the value of the property sold, or perhaps it might be more aptly characterized as one in the nature of a suit for money had and received. In this state, one whose goods are wrongfully taken and used by another may sue in *assumpsit* for their value, as for goods sold and delivered [citing the cases which we have heretofore referred to]. But we are not greatly concerned about the form of the action. In this state we have but one form of action which has no special designation and it cannot be defeated, as at common law, because not properly named" (citing *Faulkner* v. *First National Bank*, 130 Cal. 263 [62 Pac. 463]). In the case of *French* v. *Robbins*, 172 Cal. 670 [158 Pac. 188], relied upon by the appellant, the action was not for the value of the goods wrongfully converted, but for money had and received by reason of the sale of property belonging to the plaintiff and necessarily required proof as to the money

received by the defendant, and is not authority here. Likewise, the case of *Hallidie* v. *Enginger*, 175 Cal. 505 [166 Pac. 1], urged upon our attention by the appellant, is not pertinent to this action. The question there presented and determined was when a writ of attachment would lie, and not whether a plaintiff could or could not recover from one who had stolen his property, the value of the goods stolen. Again, the case of *Lehmann* v. *Schmidt*, does not support the appellant's contention. The opening sentence of the opinion in that case is in the following words: "The authorities are clear upon the proposition that when one person converts to his own use the personal property of another, the latter may waive the tort and sue in *assumpsit* for the value thereof" (citing several authorities). ▮ These cases are sufficient to clearly establish the law in this state that one whose property has been stolen by another may waive the tort and sue and recover the value of the property so wrongfully taken and conveyed. We think each complaint states a good cause of action, at least as against a general objection. ˙

▮ It is finally urged that the testimony is insufficient to support the findings in that it does not show the articles of merchandise received by the defendant through the activity of Goldstone. In order to understand the testimony to which we are about to refer, we will first state that a United States inspector submitted two lists of merchandise which had been abstracted from the mails by Goldstone during the period of time involved in said actions. These lists were in the hands of the attorneys for the respective parties during the examination of the witness Goldstone, and were submitted to him by counsel for inspection, and his testimony was all directed to the various articles mentioned therein. With this explanation we may examine the testimony to ascertain to what extent it supports the findings of the trial court. The witness Goldstone testified in substance as follows: That he began operations the last part of March and continued the same up to about the 18th of June, 1926. That he took different parcels from the mails and sold them to Kubo and Hashimoto. That the store conducted by Kubo & Company was situate on Oak Street in the city of Marysville, about seventy-five feet from the postoffice

therein. That he did not dispose of any articles taken to anyone excepting to Kubo & Company. When shown the lists just mentioned, on direct examination, the witness stated he could not positively identify any particular article. That whenever he had a chance to put a package over he took it from the mails and delivered it to Kubo & Company. The direct examination of the witness does leave the testimony in doubt as to whether or not all of the stolen parcels mentioned in the lists as being taken from the mails by Goldstone were delivered to Kubo & Company, but the cross-examination we think clears up this matter sufficiently to support the findings of the trial court, excepting as hereinafter stated. With the lists of the property stolen as hereinabove referred to, shown to the witness, on cross-examination said witness testified as follows: "It is impossible for me to identify any of these packages here because they are not like the way I delivered them. Sometimes I tore open the box, tore off the top; sometimes he'd tear it off later. I didn't have a talk with the Inspector. When the list was presented to me the first time I had nothing to do with making it up. Q. Now then, just what was your method of taking these parcels from the mail; just what did you do? A. I just took them and handed them over to him. . . . I did not take them right from the mail truck to the store. All would depend on what train it came on. I would place the package on the truck and drive around the block and hop it off. I would drive the mail truck up in front of the store. I was paid for every package that I delivered. . . . Q. By the time you made your deliveries to Kubo and you made your deliveries to Hashimoto,—you testified to this this afternoon that you would make your deliveries of these packages to either Kubo or Hashimoto,— that you would say, 'I have a package?' A. Not all the time; just passed by the store and when the train came in I would drive around. The only time I would tell him was when the 3:15 came in. Most of the stuff came on the 3:15; some at 6:20. . . . That stuff, I got it after work; leave it on the mail truck; I would leave it outside. I would stay around until I had a chance to drive up to his store on the side of the postoffice. It is about 75 feet from the postoffice. I would deliver it at night sometimes

around 9 o'clock; sometimes at 11:00 o'clock. Sometimes I would hold it over until I saw him in the morning. After I got through my work I would drop around and say I had a package. The packages that came in at 3:15 I put in my room; then I would take it out on the truck. Q. Is that true of all these packages? A. I didn't, as I say, all the time, but most of the time, some of the time, but not all of the time. . . . I didn't keep these packages in the mail truck all the time. Sometimes I took them to my room. Sometimes it would be 4 or 5 days or a week after I received the goods before I delivered them. I never did keep these parcels more than twenty-four hours in my room. I didn't do anything until he told me he wanted cigarettes. I would pick up a package when he wanted it. I would take up a package and let him know I got it, and that is the way it goes. When I went to his place to get a drink of soda, he would say, 'Got any Strikes or Chesterfields?' . . . It would be 2 or 3 days, and I would drop in the following night and give him a package. I never sold any articles to anybody else. There were no articles in my room at the time I was arrested which I had taken from the mail. I never delivered any auto tubes, auto tires, hams, candies, ice cream cartons or pimento loaves to Kubo & Company." There being no other testimony in the record as to parcels described as auto tubes, auto tires, hams, candies, ice-cream cartons, and pimento loaves, the value of those items allowed in the judgments referred to must be stricken therefrom. Thus, in action No. 5819 the plaintiff is allowed for the value of parcels in the sum of $60.16 in excess of what is shown by the testimony, and in action No. 5854 the plaintiff has been allowed for the value of parcels in excess of that shown by the testimony in the sum of $151.30. It follows, therefore, that the judgment in action No. 5819 must be reduced to the sum of $593.07, and the judgment in action No. 5854 must be reduced to the sum of $492.02. And it is so ordered. The objection to the admission of the lists in evidence need not be considered by reason of the fact that if any error was committed therein, it in nowise affected the judgment, as the cause of action rests entirely upon the testimony of Goldstone.

It is therefore ordered that the judgment in action No. 5819 be modified to award the plaintiff the sum of $593.07, and action No. 5854 be modified so as to award the plaintiff the sum of $492.02, and as so modified, the judgments will be affirmed.

Appellant is allowed its costs on appeal.

Finch, P. J., and Hart, J., concurred.